[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION 
 I — Background 
The plaintiff Stephen Dent brought this action to enforce the terms of CT Page 4527 a fight of way and what is commonly referred to as a "view easement" in favor of his residential property and over neighboring property owned by the Lovejoys. Both properties are located in the Riverside section of the Town of Greenwich, and until 1956, they were part of a larger tract of land owned by Irven Brod. The Brod tract consisted of a large stone residence and approximately 14 acres of waterfront property overlooking the Riverside Yacht Club and sloping down to Cos Cob Harbor.
In 1956 Brod subdivided his land, and sold the residence and a little less than two acres immediately surrounding it, including a sunken formal garden area, to William and Priscilla McKeehan. The McKeehan parcel was approximately three hundred feet from the water at its closest point. Brod retained the property south of the McKeehan parcel, between the residence and the shoreline. The axis of the residence runs generally east-west and the rear of the residence including the living and dining area, the attached terrace, and the sunken garden area (which now contains a swimming pool), look generally south over the Harbor and Long Island Sound beyond. The deed from Brod to McKeehan, dated and recorded March 1, 1956, contained two provisions of importance to this case. First it granted the McKeehan property a right-of-way to the waterfront:
Said premises are conveyed together with the following:
 1. An Easement to pass and repass over the 10 foot strip of land shown on said map leading from the premises above described, to the waters of Cos Cob Harbor, intending to include within terms of the easement such riparian and littoral rights to the waters of Cos Cob Harbor as may be appurtenant to said 10 foot strip of land.
Ex. 3, p. 540, ¶ 1. Second, it provided:
 The grantor, on behalf of himself, his heirs and assigns, hereby covenants and agrees with the grantees and their heirs and assigns as follows:
1. That no building or structure of any type or road (exclusive of driveways) and that no solid fences of any type shall be constructed or maintained on the property of the Grantor lying southerly of the above described premises and lying between the two view lines shown on the above described map. The Grantor further covenants and agrees on behalf of himself, his heirs and assigns forever, that in the event the planting hereinafter planted within the area shown on CT Page 4528 said map lying between the two view lines shall exceed a height of six feet and in the further event that in the sole discretion of the owner of the premises herein conveyed such planting shall constitute an obstruction to the view of the waters of Mianus River, Cos Cob Harbor or Long Island Sound, such planting shall be ordered removed or trimmed or cut back by the owner of the premises herein described, provided such owner shall first have given thirty days written notice thereof to the owners of the premises upon which such obstruction shall be deemed to exist, and the owners of the premises herein described shall have the right to enter for such purposes. It is understood and agreed that the land lying between said view lines shall be deemed to include HANNAH MARIA ISLAND, only as to future structures and to future planting in excess of 12 feet in height.
Ex. 3, pp. 541-42. The map referred to was recorded Map 3557 "Property of William C. McKeehan" which depicted the ten foot wide right-of-way extending almost due south from the McKeehan property to the waterfront and two "view lines" extending as two radii from the back or south side of the residence out to the Harbor so that the distance between the lines is seventy feet when they cross the southern boundary of the McKeehan property and approximately 220 feet as they cross the shoreline. Thus, the area of Brod's remaining property subjected to the view easement was a strip of land gradually widening as it approaches the shoreline. The right-of-way is entirely encompassed within the area of the view easement. Ex. 9.
In 1960, Brod sold a parcel of the land between the McKeehan property and the shoreline and located south and west of the McKeehan property to Allen F. Lovejoy and Betty F. Lovejoy who built a house there. Brod retained and eventually built another house on the land south and east of the McKeehan property, adjacent to and east of the Lovejoy property. The view easement area covers portions of both the Lovejoy property and the retained Brod property. The property line between the Brod and Lovejoy parcels runs down the middle of the right-of-way so that five feet of the right-of-way is on the Lovejoy parcel and five feet on the Brod parcel. Ex.9. The deed to the Lovejoys was subject to the view easement and right-of-way provision contained in the deed to the McKeehans. Ex. 2, p 577, ¶ 13.
Stephen Dent purchased what has been referred to as McKeehan property in 1993 and resides there with his family today. That property will be referred to henceforth as the Dent property. The deed to Dent expressly CT Page 4529 carried with it the benefits of the view easement and right-of-way. Ex. 1, p 348. In 1993, Allen and Betty Lovejoy resided on their shoreline property, and Philip and Patricia Denniston owned and lived on the shoreline parcel originally retained by Brod.
Shortly after he purchased his property, Dent asked the Lovejoys and Dennistons to remove or trim certain trees and plantings he considered to be unlawfully blocking his enjoyment of the view easement. The Lovejoys and Dennistons agreed to do so only in part. In 1994, Dent commenced this lawsuit against the Lovejoys and Dennistons. In the intervening years, Dent and the Dennistons resolved their dispute and that part of the case was settled and withdrawn. Allen F. Lovejoy has died and the three Lovejoy children Allen P. Lovejoy, Charles F. Lovejoy and Jennifer L. Craddock have been substituted as defendants in the capacity as Executors of their father's estate and Conservators of the estate of their mother Betty Lovejoy.
 II — The Pleadings
In his complaint, Dent alleged that certain trees on the Lovejoy Property within the boundary of the view easement obstructed his view of Cos Cob Harbor, the Mianus River and Long Island Sound, and that at least one tree was located in and obstructing the right-of-way. Dent seeks a declaratory judgment against the Lovejoys declaring his rights under the view easement and right-of-way to require certain trees to be trimmed, or removed and obstructions to the right-of-way removed. He seeks a permanent injunction banning the Lovejoys from obstructing the view easement and right of way. Dent also seeks money damages for the unlawful deprivation of his rights.
The Lovejoys denied many of the material allegations of the complaint and asserted that certain trees were not subject to the six foot height limitation of the view easement and that the right of way was not obstructed. They also asserted special defenses of adverse possession and prescription.
The case was tried to the court between September 26 and October 10, 2001 and the last post trial submission by the parties was filed in early January 2002. While the issues were hotly contested, the court would like to note, with appreciation, the contributions of counsel for both sides. The presentation of legal arguments, live testimony (including that of several experts) deposition testimony and exhibits (over 125) was marked by thorough and intelligent preparation, cooperation, candor and a high level of professional advocacy.
 III — Discussion
CT Page 4530
A. The Issues
The focus of this case is on two trees: (1) a European Birch, perhaps fifty feet in height located approximately seventy feet south of the Dent Property in the dead center of the right-of-way, half on the Denniston property and half on the Lovejoy property,[1] and (2) a less imposing Grey Birch Clump perhaps twenty feet tall and located within the view easement area on the Lovejoy property, to the west of the right-of-way and perhaps 120 feet or more south of the Dent property. Ex. 9. When in full leaf, the European Birch unquestionably impairs the view from the Dent property of a sizeable portion of Cos Cob Harbor and Long Island Sound. Exs 11, 12. Dent also contends it obstructs the right-of-way. The Grey Birch Clump, shorter and further south, has a lesser impact on the view.[2]
The issues presented involve the meaning and scope of the language of the view easement and to what extent enforcement of the easement, as interpreted, and the right of way shall impact on the trees described above.[3]
B. The language of the view easement
The critical language of the deed from Brod to the McKeehans, which has been incorporated into the deeds to the Lovejoy and Dent properties, follows the language prohibiting any building, structure, road or solid fence between the view lines. The next sentence reads in pertinent part:
 The grantor further covenants and agrees on behalf of himself, his heirs and assigns forever, that in the event the planting hereinafter planted within [the view lines] shall exceed a height of six feet [the owner of the Dent property shall have rights to remove or trim]
Ex. 3. The parties' contentions focus on the meaning and interpretation of the phrase "planting hereinafter planted". Dent contends that the purpose of the easement language as, a whole and the reasonable expectations of the parties, was to preserve the panoramic view of the Harbor and the Sound for the Dent property and should be respected. Furthermore, he points out the word "hereinafter" does not, in any accepted definition, mean hereafter or in the future. The Lovejoys, on the other hand, argue that the easement language as it pertains to trees and shrubs affects only those planted after the March 1, 1956 deed and exempts then existing growth within the view lines, which they allege include the European Birch and Grey Birch Clump. CT Page 4531
The Connecticut Appellate Court has recently restated the rules of interpreting easements created by deed
 To determine the nature of an easement created by deed, we must discern the intention of the parties to the deed by considering the language of the deed, the situation of the property and the surrounding circumstances. . . . We give the language of the easement its ordinary import where nothing in the situation or surrounding circumstances indicates a contrary intent. . . . The meaning and effect of the reservation are to be determined, not by the actual intent of the parties, but by the intent expressed in the deed, considering all its relevant provisions and reading it in the light of the surrounding circumstances . . . and its interpretation present[s] a question of law. . . . In the construction of a deed or grant, the language is to be construed in connection with, and in reference to, the nature and condition of the subject matter of the grant at the time the instrument is executed, and the obvious purpose the parties had in view. (Citations omitted; internal quotation marks omitted)
Hoffman Fuel Co. of Danbury v. Elliott, 68 Conn. App. 272, 279-280 (2002) [quoting from Ezikovich v. Linden, 30 Conn. App. 1 cert. denied225 Conn. 919 (1993)].
Dent is quite right in his contention that the word "hereinafter" does not mean in the future, or even hereafter. The actual meaning connotes some thing to follow within, e.g. coming afterward in a document. Ex. 5 (American Heritage Dictionary, 3d.ed); The New Shorter Oxford EnglishDictionary. He also points out, correctly, that the word "hereinafter" is used properly elsewhere in the Brod-McKeehan deed. See Ex. 3. Thus, he submits that the easement language should not be interpreted to affect only future plantings made after March 1956 because the word "hereinafter" simply does not support that meaning. Dent suggests that "hereinafter" might refer to Map 3557, thereby inferring any trees not on the map are covered by the easement. With respect to this last argument the court concludes that Map 3557 was not intended to show the existence or location of trees or plantings but simply the location and metes and bounds of the parcel to be sold to the McKeehans along with the view lines and right of way. The fact that no trees or plantings are depicted thereon cannot be construed as meaning all existing trees were covered by CT Page 4532 the easement.
The remaining arguments of Dent respecting the overall purpose of the view easement to preserve the view and the meaning of "hereinafter" have more force. In the end, however, they necessitate essentially reading out of the view easement language the entire phrase "planting hereinafter planted." Our Supreme and Appellate Courts have stated that in interpreting easements we are to give the language its ordinary import, or meaning, unless surrounding circumstances indicate to the contrary, and that the effect of an easement should be determined by the words of the instrument considering all its relevant provisions and in the light of the circumstances at the time. See Lago v. Guerrette, 219 Conn. 262
(1991); American Brass Co v. Serra, 104 Conn. 139 (1926); Kelly v.Ivler, 187 Conn. 31 (1982); Hoffman Fuel Co. of Danbury v. Elliot, supra. In attempting to harmonize these tenets, the court finds that the phrase "planting hereinafter planted" must be considered as an integral part of the easement. There is no language in the deed, or elsewhere, to suggest that those three words should be excised, or rendered meaningless. While the usual, or even any accepted, meaning of "hereinafter" does not fit into any reasonable construction of the easement, the surrounding circumstances and other provisions of the easement lead the court to determine that the word should be construed to mean hereafter, or afterwards.
Three factors lead to this conclusion. First, the deed contains provisions respecting Hannah Mariah Island which is located just off the shoreline and clearly restricts only future plantings to a height of no more than twelve feet. Thus, the court's interpretation of the on shore provisions of the easement, is consistent with, and complementary to, the provision affecting the island. Second, the court's construction is consistent with the circumstances surrounding the creation of the easement. Brod began his subdivision project by selling the one developed portion of his property but retaining almost twelve acres including the shoreline property. These circumstances made it incumbent that the value and attractiveness of the residence be protected from the future development on the retained property which now stood between the residence and the water. The essential purpose of the easement, it seems to this court, was to protect the view from the Dent property from being adversely affected by the future development of residences on the land sloping down to the shore. Thus, houses, roads and solid fences, none of which existed in the area in 1956, were prohibited outright within the view lines. The easement would prohibit the trees and shrubs added around new construction as landscaping from exceeding six feet in height.
Third, there is no evidence in the easement language that any changes to the existing condition of the property within the view lines was CT Page 4533 contemplated. The evidence shows that around 1956 the property below the sunken formal garden was maintained in the relatively natural state of a meadow sloping to the water. A few trees existed on the meadow and toward the harbor a substantial area of reeds and marsh grass existed before one reached open water. Exs. 41, 42, 55; Tr. 9-26-01, 51. The evidence also shows that one or more of the trees or shrubs in existence in the area exceeded six feet in height. See discussion infra. There is not a hint in the deed language that Brod intended that these trees, which he owned, be subject to immediate cutting or trimming. What he might have intended as to trees that might grow substantially taller in forty years time is only speculation.[4] The court holds that the easement's language as to plantings in the view easement area imposes a six foot limitation on those trees and shrubs not in existence in the view easement area on March 1, 1956.
C. The Applicability of the Easement's Restrictions
The court now turns to the parties' conflicting factual contentions as to whether various trees pre-dated March 1956 at their present locations within the view lines. The evidence on this point consisted inter alia of testimony by a number of persons who lived on, or regularly visited, the Lovejoy and Dent properties in the 1950's and 1960's and afterward (some of this was childhood recollections) family photographs or movie films, aerial photographs and a core sample from the European Birch which was subject to conflicting expert testimony.
1. The European Birch
The most pertinent testimony presented by the Lovejoys were in the depositions of Allen F. and Betty Lovejoy, who purchased their property in 1960 and built their residence soon thereafter, the testimony by deposition of Priscilla Pym, formerly McKeehan, who purchased the now Dent property and resided there in 1956 and 1957, and the testimony by deposition of Stephanie Warden (nee Brod) who lived in the newly build Brod house near the water in the early 1960's.
Both Allen F. and Betty Lovejoy testified that the European Birch tree was in its present location in early July 1956 when they visited the McKeehan's newly purchased residence to watch the Independence Day fireworks. Ex. 114, pp. 9-10; Ex. 117, pp. 28-9. The European Birch was described as fifteen to twenty feet high. Ex. 114, pp. 9-10; Ex. 117, p. 31.
Pym testified she had been familiar with the house and grounds she and her husband purchased from Brod in 1956 as far back as 1952, and that the European Birch tree was in what appears to be its present location with a CT Page 4534 trunk diameter of maybe four to five inches. Ex. 121, pp. 9, 23-26; see Exs. 55, 90. Warden was born in 1958 and lived in the house Brod built closer to the water from 1962. Her recollection encompasses the mid-1960's and she places a mature birch in its present location. Ex. 123.[5]
The Lovejoys also presented a number of photographs[6] in support of the contention that the European Birch was located in the view easement area prior to March, 1956. While none of the photographs are earlier than that date, they nevertheless carry some weight. Pym testified that certain photographs were taken by her brother while visiting her home from Great Britain in the summer of 1956. These pictures include two photographs looking south from the residence on the Dent property across the sunken formal garden toward Cos Cob Harbor, Exs. 51-52, and a photograph looking southwest from a different vantage point showing the top of the Riverside Yacht Club building. Ex. 54. Allen F. Lovejoy identified the European Birch in these photographs but it is not clearly shown in Exs. 51-52. It may be more clear in Exhibit 54, but not perfectly identifiable.
Exhibit 55 is an aerial photograph taken in the fall of 1958 looking north north eastward over the property then retained by Brod but subsequently sold to the Lovejoys and showing the formal garden on the southern portion of the Dent property. The photograph clearly shows two coniferous trees and a less clear, but identifiable, birch tree in what appears to be its present location seventy feet south of the formal garden. This photograph is of value because it is most likely to show how the property looked two and one half years earlier. In 1958, Brod had not sold property to the Lovejoys, and no development had taken place.
The Lovejoys also produced a photograph made from a movie film taken by Allen F. Lovejoy in November, 1960 shortly after the foundation to his house had been laid. Ex. 57; Ex. 114, p. 79. This picture looking roughly east at ground level from the Lovejoys' property shows two coniferous trees and a white birch tree in what appears to be the same location shown on the earlier aerial picture taken in 1958 and in the same location described by Pym and the Lovejoys in their depositions. Ex., 57.
For his part, Dent points out a number of inconsistencies in the testimony of the Lovejoys and Pym. The latter, for instance, testified that the birch was a "little to the right" of the center of the formal garden when in fact, it is directly in the center. Ex. 122, p. 58. There are also instances where Allen F. Lovejoy found it difficult to identify the European Birch and Grey Birch Clump in certain pictures. See, Ex. 116, pp. 99-120. CT Page 4535
Dent also proffered that testimony of Lemuel Johnson, a photogrammetrist. Photogrammetry was explained to be the science of making accurate measurements and identifying features from aerial photographs. Tr. 10-2-01, 9. In examining aerial photographs for his testimony Johnson uses two photographs and an Analytical Stereo Plotter which provides a type of three dimensional view. Id. 14-15. Reviewing aerial photographs made of the Cos Cob Harbor area in 1951 by the United States Department of Agriculture, as well as 1980 and 1990 photographs of the same area made under the auspices of the Connecticut Department of Environmental Protection (all these photographs cover far more area from a higher elevation than Exhibit 55) Johnson testified that while he saw the European Birch on the 1980 and 1990 photographs, he "did not see evidence of any trees" at the birch's present location in the 1951 photograph. Id. 25. However, when shown Exhibit 55 Johnson testified that while the two coniferous trees would certainly have showed up in the 1951 USDA photograph, the birch tree might "not necessarily appear because of a lack of visible tree canopy." Id. 46. Another aerial photograph of indeterminate date, but likely pre-1960, also shows the two coniferous trees which appear in Exhibit 55, but the European Birch is not visible. Ex 48. This photograph is the least distinct of those considered.
Dent also offered the testimony of Alexander Fritzsche whose family owned and lived on the Dent property from 1963 to early 1970. Fritzsche was twelve or thirteen years old in 1963. Tr. 9-2601, 47. Fritzsche testified that he walked up and down the right of way area between the formal garden on numerous occasions, sometimes dragging a Sunfish boat or dingy. In that right of way, he recalls a young white barked tree which was staked and wired and which occasionally impeded his efforts to transport the boat. He specifically recalled the wires being attached to the tree trunk by orange or red strapping. Id. 53-56. He located this tree "fairly" close to the south side of the formal garden, closer perhaps than the white barked tree shown on Exhibit 55. Id. 54, 94. Fritzsche did not believe the tree shown on Exhibit 55 was the staked tree he remembered from the mid-1960's. Id. 109.
Dent and the Lovejoys presented expert testimony from one former and one present professor of the Yale University School of Forestry concerning the age and history of the European Birch. In 1994 Professor Thomas Siccama from Yale, an expert retained by the Lovejoys, took a core sample from the European Birch. A core is a piece of wood, about the circumference of a pencil, which is physically removed from a tree. The core represents a cross-section of a tree from the outer bark to as close to the center as possible, and it provides, under proper analysis, a recognized (and non lethal) means of ascertaining the approximate age of a living tree, as well as other indicia of its history. Both Professor CT Page 4536 Siccama and Professor Bruce Larsen, formerly of Yale and now Professor at the College of Forest Resources at the University of Washington who was retained by Dent, analyzed the core taken from the European Birch.
Both experts placed the germination or beginning of the tree's life at between 1946 and 1948. Tr. 10-4-01, 20, 72; Tr. 10-10-01, 112-13. Both opined that the tree was probably transplanted to its present location some time after its growth had begun. Tr. 10-4-01, 44, 134-35; Tr. 10-10-01, 58.
The court found both Siccama and Larsen, while markedly different in manner, to be proficient, knowledgeable and articulate in their field. They attempted to establish the tree's chronology by working backwards in time since the only certain date in the core was that of the outside ring, i.e. 1994. While Siccama and Larsen agreed on much of their separate analyses of the European Birch core, there were two areas of disagreement. Somewhere in the dozen years leading up to 1994 the two experts disagreed by two as to the number of annual growth rings shown on the core. Siccama's opinion was that the core showed two more years of growth then the number determined by Larsen. A review of the measurements of the width of the annual rings shows remarkable agreement between the two for the twenty-five years preceding that divergence. Compare Exhibit 67 (Larsen measurements) with Exhibit 70 (Siccama measurements). The second area of disagreement occurred with the analyses of 1954-55 (Siccama) and 1957 (Larsen). Simply put, Larsen testified that the ring he identified for the year 1957 showed remarkable width (indicating tree growth) of over 20 millimeters followed by four years of an abnormally low growth rate ranging from about 5 to 7.2 millimeters in 1958 to 1961. Larsen's opinion, after ruling out other possibilities, was that the European Birch had been transplanted after the 1957 growing season to its present location, and the low growth rate in the following years resulted from the trauma of relocation.
On the other hand, Siccama concluded that the single large growth ring seen by Larsen actually encompassed two years which, because of the earlier differences, he believed occurred in 1954 and 1955. Under Siccama's analysis therefore, the tree's growth pattern did not change drastically, since in effect, Larsen's one year's growth was actually two year's. Siccama opined that the European Birch had been transplanted to its present location in 1952 based on staining that he saw on the core in that year which he attributed to damage to the tree during, or as a result of, transplantation.
The hypotheses of both experts were well presented, but both had areas which gave the court concern as to their validity. There was evidence, for instance, that the staining seen by Siccama could very well be the CT Page 4537 result of many events other than transplantation. Both experts testified at length about their individual analysis of the core for the year 1957 (Larsen view) or the years 1954-55 (Siccama view). Much of the testimony related to whether the core contained a "false ring" which occurs when something abnormal transpires in the environment during a tree's usual growing season causing growth to decelerate or stop for a period, and then resume. Such a stoppage and resumption could affect a tree to such a degree that its growth pattern, as reflected in the core, looks like the normal stoppage which occurs in the autumn of each year. In a year with such an environmental abnormality one might see a ring in the core which is not, in fact, an annual ring, but a false ring resulting from the irregular interruption of growth. While Larsen's theory that the European Birch was planted in its present location in late 1957 or early 1958 is not unreasonable, the court notes that the very large growth year found by Larsen also, by his opinion, contained a false ring indicating an actual stoppage of growth during the same year. This appears to be inconsistent.
The plausibility of the evidence whether there was a false ring in the 1950's was evenly balanced. Perhaps as important to the issues in this case, however, was the disagreement as to the exact number of annual rings existing in the mid to late 1980's. Surprisingly, there was very little evidence on this point from which the court could draw any conclusion. See Tr. 10-4-02, 133; Tr. 10-10-02, 49. This is critical because even if Larsen is correct in his opinion that transplantation took place between the large growth year and the succeeding year of low growth, the material question is whether it took place between 1957 and 1958, or two years earlier. Neither expert provided sufficient evidence to resolve that issue.
The foregoing review of the evidence only partially encompasses all the evidence presented on the issue when the European Birch reached its present site. However, it summarizes what the court believes are the most pertinent points.
The court concludes that the testimony of the Lovejoys and Pym is persuasive to the effect that the tree was in its present location in July, 1956 and to their knowledge no trees were transplanted to that area between 1952 and 1960. Ex. 114, p. 18; Ex. 121, pp. 28-29. Larsen also concluded that the tree had a trunk of between six and ten inches in diameter at the time he believed it was transplanted. Tr. 10-10-01, 131-132. This not only is a large tree to transplant, it is consistent with the Lovejoys' and Pym's description. The testimony of Fritzsche that a much smaller tree which was staked and wired at that spot in the mid-1960's does not fit with either the Larsen hypothesis relating to size and age (Fritzsche testified that at age 12 or 13 he could encircle CT Page 4538 the tree's trunk with both hands, Tr. 9-26-01, 55-56.)
The most persuasive evidence are the pictures which strongly support the testimony of the Lovejoys and Pym. Exhibits 55 and 57 show a birch tree standing in what appears to be its present location and there is no evidence it was recently transplanted.[7] The court concedes that the testimony of Johnson, the professional photogrammetist, does not support its conclusion. However, neither is it inconsistent, since the lack of a tree in the autumn of 1951 aerial photograph does not establish conclusively that it was not planted in the intervening four and one half years, and as noted, Johnson could not rule out the tree, if it was in place, might not have been identifiable from the photograph. Based on all the evidence, the court finds that the European Birch was in its present location before the view easement was granted and is exempt therefrom.
2. The Grey Birch Clump
Contrary to the European Birch, the Grey Birch Clump does appear in the 1951 photograph interpreted by Johnson. It appears as a single trunk specimen. The Pym photographs taken in 1956 appear to show the tree's foliage but not its trunk. Exs. 51-52. Today, at the same location, there is a tree with multiple trunks. The corings of Siccama establish that not one of these multiple trunks existed before 1960. The evidence is unclear as to what happened. However, a topographical map prepared for Allen F. Lovejoy in 1960 indicates that at the Clump's present location, there was a birch with a trunk diameter of four inches. Ex. 64. Apparently, that single trunk died or was cut down, or both. As testified to by Siccama and Larsen, when that occurs existing cells in the root crown may form supplementary sprouts that grow into a clump of tree trunks using the root system. Larsen said "[i]t would have been the dying of the tree that allowed those sprouts to emerge." Tr. 10-10-02, 146. Both experts agreed that the original tree trunk and foliage had died, but the root crown did not die, and that the clump of trunks now existing would likely not have occurred without the death of the original trunk. Tr. 10-04-01, 119; Tr. 10-10-01, 97-101. Both also defined a tree as consisting of a trunk, foliage and root system. Tr. 10-04-01, 121, 129; Tr. 10-10-01, 147.
From this amalgam of biology and botany, the court concludes that the original grey birch tree no longer exists. What now exists is Grey Birch Clump at the same location with different trunks and foliage perhaps using part of the previous root system, but also growing its own. Tr. 10-10-01, 97.
The more difficult question is whether this clump is subject to the view easement; is it a "planting hereinafter planted"? The court determines that it is. While an argument may be made that the present CT Page 4539 clump was neither "planted" nor is a "planting", even Allen F. Lovejoy, the most ardent defender of the Grey Birch Clump (see e.g. Ex. 114, 24) impliedly conceded that an argument could be made that planting could occur from natural causes. Ex. 32, p. 3. Whatever it is deemed to be, it is, in effect, within the scope of what the court has previously found to be the proper construction of the easement language: to prohibit new trees, shrubs etc., within the easement area, from exceeding six feet in height. The Grey Birch Clump is new, i.e. post 1956, and it is in excess of six feet high. It is within the proscriptions of the view easement.
3. The Austrian Pine
Very little evidence was presented with respect to an Austrian Pine situated on the Lovejoys property. The tree is now dead, and the Lovejoys have agreed to remove the dead trunk. See note 2 supra. The court finds that the Austrian Pine was at the present location on March 1, 1996 based on the previously discussed photographs. Exs. 51-52, 54-55, 57. The Lovejoys decision to remove the dead tree is correct. It is no longer a tree but a solid obstruction banned by the view easement.
D. Right of Way
The European Birch is located in the middle of the right of way and the approximate two foot diameter of its trunk clearly obstructs, at that point, twenty percent of the right of way's width. The language of the right of way grants to the Dent property a right "to pass and repass" and "such riparian and littoral rights as may be appurtenant to said 10 foot strip of land." The tree does not obstruct use of the right of way by foot, and the testimony of several past residents of the Dent property confirmed that. See, e.g. Ex. 74, pp. 12-13. Fritzsche testified that it was possible to transport a Sunfish boat along the right of way (his difficulties resulted from the weight of the boat not from the presence of a tree). Tr. 9-26-01, 83. A kayak or canoe can be carried up and down the way by one or two people.
The right of way is not physically amenable to use by a motor vehicle or other means of towing. Its northern terminus is the entrance to the formal garden and there is no feasible mode of access to the ten foot strip without traversing the pool area and stone steps. See Ex. 11, 12, 61; see also, Tr. 9-26-01, 76; Tr. 9-27-01, 50. The court concludes that the intent of the right of way was to allow those residing on the Dent property access by foot to the shore of Cos Cob Bay. The European Birch does not materially affect this use.
The use of an easement must be reasonable and as little burdensome to the servient estate as the nature CT Page 4540 of the easement and the purpose will permit. . . . The owner of an easement has all rights incident or necessary to its proper enjoyment, but nothing more.
Peterson v. Oxford, 189 Conn. 740, 744-45 (1983 (citations omitted). Removal of the European Birch is not necessary to the proper use and enjoyment of the right of way.
 IV — Damages
Dent has claimed money damages to compensate for the loss of enjoyment as a result of violation of the view easement. The evidence on claimed damages was presented through the testimony and written appraisal report of Peter M. Trefny, a licensed real estate appraiser active in the Greenwich area. Trefny stated his opinion that the loss of enjoyment as a result of a partial view obstruction could be calculated in a dollar value by estimating the percentage loss in value of the property itself resulting from an obstructed view and then applying that reduction to an estimated rental value of the house. For instance, as of January 1, 2001 Trefny estimated the monthly rental value of the Dent property to be $30,000 if there were no obstructed views and $26,125 with views obstructed by the European Birch, Grey Birch Clump and Austrian Pine, a reduction of 12.9%. Using this method, the loss calculated from 1993 to July 15, 2002 was estimated at $360,000. Ex. 82.
The Lovejoys presented the testimony of Patrick J. Wellspeak and his letter report in opposition to Mr. Trefny's analysis. Among other things, Mr. Wellspeak was critical of the comparable sales used by Trefny to establish value and the failure to isolate the view factor of a residence to more accurately assess its value. Ex. 106; Tr. 10-4-02, 155-56. Trefny's report conceded that "[i]deally, recent sales of properties with unobstructed views would be compared with recent sales of similar properties with obstructed views to isolate the loss in value due to the obstruction." Ex. 82, p. 31. However, available market data did not make this fully possible. Id.
The determinations made earlier in this decision, of course, radically change the scope of possible damages, since only the Grey Birch Clump has been found to violate the view easement. Trefny described the partial obstruction of the Dent's view as resulting from the European Birch, Austrian Pine and "a column of trees that is south east of [the European Birch]". Tr. 9-27-02, 95. His report indicates that probably this "column" (an error in transcription) is the Grey Birch Clump, although in fact it is southwest of the European Birch. Ex. 82, p. 12. There is little direct evidence as to the loss of value, if any, caused by the Grey Birch Clump alone. CT Page 4541
Trefny made his partial loss of view valuation on the basis that the view obstructed was that of Long Island Sound and New York City skyline which he pointed out was the "crem[e]-de-la-crem[e] triple A top of the line water view." Tr. 9-27-0 1, 99, 106. However, it is more the European Birch which obstructs this view than the Grey Birch Clump. Exs. 11, 12. Indeed, the latter obstructs only a relatively small portion of the overall view.
Two other factors should be considered. Trefny conceded that his valuation procedure did not factor in that the birch trees were deciduous and their effect on the view is substantially less during that period of each year when they do not bear leaves. Tr. 9-27-01, 125; Compare Exs. 11, 12 with Ex. 13. Also, there was testimony that some time during the period 1983 to 1993 when Mary Louise Pappas owned the Dent property, Allen F. Lovejoy pruned the Grey Birch Clump. Ex. 44; Tr. 10-3-01, 81. An inference may be drawn that the Grey Birch Clump did not obstruct the Dent's view to its present extent throughout the Dents' tenure. On the other hand, Dent testified that in 1993 when he first discussed the matter with the Lovejoys, he raised the subject of the Grey Birch Clump ("column" in the transcript) as having "very overgrown appearance". Tr. 9-27-01, 30.
The court expressed some concerns during the trial over the method of equating the relatively objective measure of rental value of a residence with the actual damages for the subjective loss of enjoyment claimed by Dent. Trefny's candid response was that he did not know of any other means of quantifying the loss. Tr. 9-27-01, 129, 138-39.
The court concludes that the rental value approach may not be the best, or only, approach to valuing damages, but recognizes that it can provide a useful tool in that endeavor, if applied with several significant alterations. First, Trefny's damage calculation included a prejudgment interest factor not appropriate for the tort type of damage sought in this case. Second, the lack of market data allowing one to isolate the value differences between a partially obstructed and unobstructed view makes Trefny's calculations somewhat speculative. Assuming that the loss calculated by Trefny would be $385,000 as of April 2002 that figure should be reduced by $80,000 to eliminate the interest and another $150,000 to wring out any aspect of speculation, leaving an amount of $155,000 as reflecting the value of the loss of view obstructed by the European Birch, the Austrian Pine and the Grey Birch Clump. To account for the fact that for at least 42 percent of the year (five months), the obstruction of the view by the two birch trees is drastically reduced (in fact, negligible for the Grey Birch Clump) the value is reduced to $65,000. The court estimates that the Grey Birch CT Page 4542 Clump contributed to no more then ten percent of the obstruction and threfore the Trefny model, as altered, would suggest damages in the amount of $6,510.
The court recognizes that reasonable people could take issue with some, if not all, of the adjustments discussed above. Nevertheless, it provides some measure of support for the court's own damages assessment which is based on hearing all the testimony, reviewing all the exhibits and the opportunity to view the scene in person. Fair, just and reasonable damages, based on the minimal, but not inconsequential impairment of the view by the Grey Birch Clump is in the range of $750 to $1,000 annually, making allowance for the tree's growth. Therefore, the court sets damages at $750 for the first year of Dent's ownership, and increases the amount by $50 each succeeding year so that it reaches and remains at $1,000 for the year ending June 1999 and thereafter for a total of $8,000 to date.
 V — Conclusion and Orders
Based on the preceding discussion, the court makes the following conclusions and orders.
1. The plaintiff Dent is entitled to a declaratory judgment against the defendants Lovejoys under Counts One and Two of the Amended Complaint that the Grey Birch Clump, identified on Exhibit 9 as "Birch Clump" and the vestige of the Austrian Pine are subject to the restrictions and proscriptions contained in view easement in the deed from Brod to McKeehans, dated and recorded March 1, 1956.
2. The issues in Counts Five and Six are found in favor of the defendants.
3. As to the issues and claims in Counts Eleven and Twelve, the defendants are permanently enjoined from interfering or obstructing the plaintiff in his attempts to enforce the view easement as to the Grey Birch Clump and the vestige of the Austrian Pine.
4. The issues in Counts Fifteen and Sixteen are found in favor of the defendants.
5. As to Counts Nineteen and Twenty, the plaintiff is awarded damages in the amount of $8,000.00 against the defendants jointly and severally.
6. The issues in Counts Twenty-three and Twenty-four are found in favor of the defendants. CT Page 4543
So Ordered.